The next case on our calendar is Meltzer Lippe Goldstein & Brightstone v. James Malfetti. Thank you. Good morning, both of you. I think that is an invitation, Your Honor. Yes, please. Mr. Ford, please. My name is Robert Calica. My firm represents the plaintiff appellate law firm, the Malfetti Law Firm, and I am here today in this dispute with a recruiter under a fee schedule. Did they bring this as a declaratory action, or? It was brought in the state court as a declaratory judgment action, but there was no burden of proof on either party in seeking declaratory relief. It was removed by the defendant, the federal court, and proceeded for a trial on the counterclaim. So Malfetti and his firm bore the burden of establishing both a contract, a breach of that contract, and damages. I would like to begin as a threshold matter with the question of whether there is deference to facts finding. It is a very material consideration in deciding this appeal. We briefed it extensively. There is no dispositive decision in this circuit, but the Seventh Circuit had been clear and unequivocal that the ordinary deference to fact finding and the clearly erroneous standard under Federal Rule 52 ought not be applied to the fact finding by a successor judge on a cold record, which is what here occurred. Great. But your client was given the opportunity to recall witnesses. That is true, Your Honor. So I don't understand where you can go with this argument. You have an opportunity, which you decided to forego, and how can you take advantage of that in the way you are undertaking to do? Judge Farca, the fact that Rule 63 gave that right to the plaintiff doesn't mean that this Court has to give deference to fact finding to a successor judge on a cold record. True, we had that right. Both parties agreed to rest on the record, but the question is, is the scope of review in this Court governed by a clearly erroneous standard under Rule 52, and it's not because that is entwined with giving deference to the ability of the trial judge to weigh the credibility of live witnesses. I just invite the Court to . . . You didn't do that when you decided to not take the judge up on his offer. Your Honor, waiving the right to call additional witnesses does not mean that there was a stipulation that review on appeal would be subject to a clearly erroneous standard. They are just not . . . the statutes aren't really in pari materia, and that has not been a consideration in the Seventh Circuit, where basically the Court specifically and emphatically, and I recommend that the Court read it, found that the reason for the rule, whether it's reviewing an exercise of discretion or fact finding with a deferential view to the trial court, does not have a rationale where the trial judge, the successor, is in no better position than the circuit court to review a cold record. Could you turn to the merits of the time remaining? Excuse me? Could you turn to the merits of the time remaining? Yes, I will. All right. Regardless of the standard under which we review it, the answer is that the factual record does not support, under settled appellate law in the New York courts and echoed in the decisions of the Federal courts and in this circuit, of continuation of dealings. Under the New York cases, it requires that the services and the transaction be substantially the same. When do you think this contract expired? Well, it applied to . . . well, it expired . . . Judge, I'll tell you this. It expired because it was not indefinite, it was not an exclusive agreement to have force to pay a fee schedule under a prior agreement that was applicable to a labor or litigation attorney, would require a new contract or an affirmation of the old contract to apply to the new transaction, but . . . Well, I'm confused because the agreement you signed with this placement firm didn't have a time limitation in it. Judge, we have extensively briefed that when no term is set, the contract is not open-ended, and particularly when you're dealing with a broker, then if the agreement does not evince an intention that it's some type of exclusive, that will continue as to other unrelated transactions. You shouldn't find that . . . When did it expire? Your Honor, it expired when the transactions for which the compensation was made for a labor attorney and a litigation attorney concluded. But let me move to the . . . Why? I mean . . . What date was that? That happened within months of the original agreement. Compensation was paid, there was no dispute, and the parties fortuitously reached out to one another to use services again. That agreement was not agreed to apply in perpetuity, and the extensive negotiations of the parties regarding the fee are compelling evidence that they didn't deem themselves to have a fixed obligation. Laffer's testimony is to the contrary. Excuse me? Laffer's testimony is that it pertained to the search of the health attorneys. I understand, Your Honor. That's why . . . Let me concede this point, if I may respectfully. Let's say the parties had an expectation that the fee agreement would continue to the new transaction for health care attorneys who were employed, who were compensated, whose fees were payable to the Meltzer firm. The fee agreement here is contingent upon employment of these ten attorneys. They weren't. The payment of their compensation, the calculation of their compensation. What occurred is that the . . . and we say at the insistence of the seller, the firm remained intact, their compensation was paid by the Kern Augustine firm, the fees went to the Kern Augustine firm, the employees did not become attorney employees of the Meltzer firm. Instead, what the one Meltzer partner acquired was a New Jersey law firm subject to $2 million of bank debt and leasehold debt. Why wasn't this the sale of a business instead of the hiring of attorneys? It was. We say it was a sale of a business. But that's not the first argument you made here. Isn't that the most dramatic argument to make? I'm pleased that Your Honor finds it compelling. Thank you. I aimed to please. Okay. It was a sale of a business. It was not the engagement, the employment of an attorney in paying compensation. If it was a sale of a business, the defendant is disentitled under the statute of frauds. But beyond that, even if the statute of frauds in New York and New Jersey did not govern, it did not entitle him to compensation under the fee agreement because the fee agreement was calculated to employment, payment of compensation, and . . . I'll just say . . . which the district court found that the attorney placement was affected as a sale in order to keep the name and comply with New Jersey law, but that it was really an attorney placement because the only assets the company had were the attorneys in their business. It was a group acquisition through a plaintiff's affiliate, the equity partner, Mr. Hyman, and therefore fell within the agreement. Tell us why that kind of a finding was impermissible here. Because it is as settled in this court as it is in the state courts, every other district in the U.S. Supreme Court, that a judge cannot rewrite a contract. And the contract was for employment and compensation and receiving the benefit of employment and compensation. The benefit here of a $40,000 sale recognized the $2 million disability of the current entity intact. It's why the fees had to go to the current firm or there would have been a voidable preference and the individual purchaser, Mr. Hyman, would have been liable under the debtor and creditor law insolvency principles. The Meltzer firm got none of the benefits. If my firm hires 10 attorneys through a recruiter and pays them $100,000 each but bills their services for $200,000 each, we retain the profits and the benefits. That is the way the fee agreement goes when you deal with a headhunter. When you buy a business that's saddled with $2 million of debt, all the fees are retained by the failing entity whose life is extinguished within 18 months, the Meltzer firm didn't get that benefit. You cannot reasonably apply a contract that says if you employ an attorney by saying in effect it's a de facto employment and that finding, whether you give deference to it or whether or not you give deference to it, simply cannot be rationally, you know, sustained under any standard because the Meltzer firm paid only $40,000. Because there was $2 million of debt, it could not bill the fees of these attorneys, it could not earn any profits, it was entirely dependent upon the success of that firm, which was why the transaction went from a $1 million to a $40,000 transaction. Only one attorney was retained by the Meltzer firm, but the 10 or 9 were part of a business purchase. Is that your argument? That is correct. And the fee agreement, even if it's found to have been adopted as a new contract for the current transaction, did not apply to the acquisition of a business. That leaves us under New York and this Court's precedent in saying the compensation under the New York telephone against Jamestown case is reasonable value. It's not express contract because you can't apply the contract methodology. And using reasonable value, there was no evidence of it in the trial. The defendant was the counterclaim plaintiff, had the burden, and chose to rest upon the fee agreement to get a $400,000 windfall on a $40,000 transaction. It doesn't fit a sale of business. It can't be applied whether or not you give deference to the findings. It was certainly not a subterfuge to frustrate the broker's right to compensation. It arose because the principal or the seller refused to allow his employees to go elsewhere. Perhaps he wanted it as a going concern, so it paid down the bank debt and the lease debt, so he would not have — whatever the reason was, it didn't fit. The transaction that occurred, if you find they're entitled to an employed contract that pay reasonable value, must be dismissed for failure of proof or remanded for a new trial on reasonable value, which will be a fragment of the $40,000 purchase price and certainly a bare minimum percentage of the $400,000 plus interest award based upon employing attorneys who weren't employed, paying them who weren't paid, and receiving the fees from their services, which were never received. Let's stop here. You reserve three minutes for rebuttal. All right. Thank you so much. We'll hear from the appellee. May it please the Court, I'm Randall Racey from the Barton Law Firm. I'm here for the appellee, Mr. Malfetti, doing business as — excuse me — management recruiters of Union County. Why wasn't this the sale of a business? Because management recruiters is not a business broker, and it is not a broker-dealer firm selling securities. Didn't this deal transmogrify into the sale of the business? Well, as Judge Hurley found and was well supported, the sale — the decision of Milter Lippe to acquire this practice group by means of a stock purchase was incidental to the task for which they expressly engaged management recruiters to find a group of — or even — they even said maybe a boutique firm and health care law practice to add to Milter Lippe. That's what management recruiters did. The fact that they chose — first of all, Mr. — my friend, Mr. Kalika, is incorrect saying that the seller, Mr. Schottman, refused to allow his employees to go elsewhere. Those employees were not indentured servants. They weren't bound to term contracts. They could have gone anywhere they wanted. And Don Laffin even testified at trial that she and the firm considered just hiring at least some of the current Augustine lawyers directly instead of buying the stock, and all the liabilities went with it. The testimony was not only plausible but quite convincing that the reason that they chose to go with the stock purchase was because the — Mr. Schottman was the main rainmaker for the firm who was leaving, and — but he had established a lot of goodwill with the current Augustine name, so the only way they could keep the current Augustine name was to keep that — To buy the business. To buy the business. The only way they could do it is buying the business. Right. And isn't buying the business different than hiring attorneys? That's my question. Yeah. I mean, as Mr. — yes, I would — I would certainly agree. And as you said, Mr. Malfetti was not a business owner. No, he wasn't. So that — why does this deal even come under any contract that existed between Mr. Malfetti's Judge Hurley did a very careful analysis under uncontroverted New York contract law of what the fee agreement actually means. He looked at the plain language of the words used in the contract, and the contract provides that the fee — placement fee is payable even if the attorneys being placed are acquired — are hired indirectly through an affiliate. Mr. Judge Hurley made careful, well-supported factual findings that, in this context, Mr. Heyman, who is an equity partner who actually bought the shares, was acting in his role as an affiliate on behalf of Miltrue Lippe, and that current Augustine itself, once it became acquired, became an affiliate under the common, plain meaning of that term of Miltrue Lippe. And under the contract, that was clearly anticipated. He didn't use the common, plain meaning, actually. I'm sorry? He didn't actually use the common, plain meaning. He went down to a definition, the ninth definition of affiliate, in order to find that they came under the use of that term. He picked — The ninth — He just said the dictionary.com. Yeah, the ninth definition. The ninth one. The ninth in that — Yes. All right. I cited — in the brief, we cited a lot of — My question is, it looks to me, it keeps looking to me, like the sale of a business, not the hiring of attorneys. It was current Augustine was purchased by Mr. Heyman, and that was the sale, that's what happened. And he purchased it for $40,000, which shows it didn't have terrific value, and that's all that happened. With respect, Your Honor, that argument that they've made is a bit of a red herring. In a normal placement of attorneys, nothing's paid up front. The cost of the transaction is zero. So to claim that this is a windfall of $400,000-plus on a $40,000 transaction is beside the point. He was not hired. Mr. Ben Asher, who was the attorney placement agent that was dealing with Mel Chalippy, he was not hired. His firm was not hired to sell shares in the business. That was Mel Chalippy's choice. He was hired — Well, Heyman wasn't controlled by Mel Chalippy, was he? He was acting as an affiliate of Mel Chalippy. The evidence is quite clear that Mel Chalippy made the determination before Mr. Heyman was Mr. Ben Asher by non-laughing in an email dated January 19, 2016, that we decided to have one or more attorneys of the firm purchase instead of us purchasing it directly. The reason was that — for that was because they determined that only a New Jersey licensed attorney could own a New Jersey professional firm. So Heyman owned less than 10 percent of Mel Chalippy — That's what they said. — at the time of the transaction. Was he to dispute that? I have no reason not to. And he was not the managing partner. He did not control Mel Chalippy at all, right? He was not an affiliate of Mel Chalippy within the meaning of the fee agreement. He was — Yes, he was. Well, explain to me how. We — in the brief and also Judge Hurley in his decision cited common definitions of affiliates, and he was acting as an — one of the definitions we cited even includes an example as an affiliate can be a member or partner. He's literally a partner of this firm under at least that definition. I think all the definitions. He is an affiliate of Mel Chalippy. He could have bought the firm — what they tried to present at trial was the idea that Mel Chalippy decided they just weren't going to go ahead with the transaction at all. And then Mr. Heyman piped up and said, hey, I think I would like to buy this on my own. Do you mind? That's clearly — that's what they argued. That's clearly not what happened. Ms. Laffin told — Mr. Heyman admitted that he had no — he had not even thought about buying the firm at the time that — Ms. Laffin told Mr. Ben Asher that they were thinking of having one or more attorneys buy the stock instead of Mel Chalippy directly. I would ask Your Honor, what would the situation be if they hadn't found that conflict and Mel Chalippy had just acquired the stock in the firm and operated as a subsidiary, which is what they originally planned to do? Would that not be an attorney placement? I don't know. I'd have to look at the terms of the acquisition. But here we know it was a purchase of this firm for $40,000. There's no doubt that they purchased — that Mr. Heyman purchased the firm for $40,000. Mr. Heyman was not — was a partner in Mel Chalippy, but he was only a 10 percent equity owner of the firm. He did this on his own because he had a New Jersey license. He did not do it on his own. Well — There's no evidence to support that. Where's the evidence that he acted for Mel Chalippy? The evidence is — was cited in depth in Judge Hurley's factual findings. He noted that they — that the decision to acquire the stock through an equity partner came before it was decided that Mr. Heyman would do it. Mr. Heyman did not present himself after the purchase as the owner of the firm. The website of Kern Augustine was amended to add him as of counsel, but it didn't identify him as an owner or having any management role. What's the significance of that? Because the idea — the idea is whether he was acting on his own, as they claim, or if he was acting as an affiliate, which I'm sorry, but he is an affiliate under the dictionary definition of Mel Chalippy, and it was the latter. Lou Meltzer went out to the law — to Kern Augustine's New Jersey office the day or one, two days after the closing and said, we're expanding to New Jersey by this acquisition of Kern Augustine. The attorney that went — that — they moved the New York attorneys from Kern Augustine into Mel Chalippy's offices. Stuart Weitzel testified on our behalf. He was one of those attorneys. He testified credibly with no — no contravention that one day an assistant from Mel Chalippy walked in and said, we're moving you to the Mel Chalippy payroll. No discussion. No offer. They treated this as if it were a subsidiary of Mel Chalippy. The fact that — How many current attorneys were on the — went on the Meltzer payroll? Just this one. And remind me of how the others were — the just compensation procedure was structured. All of the attorneys were — the only partner of the original Kern Augustine was Mr. Shotman who left and sold the shares. All the others were — they may have had partner titles, but they were employees. They all had salaries from — from Kern Augustine. And only one of them went on the Meltzer — Mel Chalippy payroll. Right. All right. Well, I've asked my questions. Thank you. Any other questions? Thank you. Mr. Kalica. I'll keep it short. You have three minutes. I'll focus on this. The point was that under this arrangement, the lease meant nothing because, in effect, Kern was a tenant and paid rent to the Mel Chalippy firm. It's no different than having three or four attorney counsel within my own or any other law firm, as here, with their own payroll, their own telephone, their own email, their own billing, their own direction of staff, their own retention of fees, none of which are enjoyed by the law firm in this case. The essence of the transaction of the sale is not compensable under the fee agreement because the formula doesn't fit. It's not compensable in an equitable sense because, in effect, the financial underpinnings of employing somebody which is spelled out in the fee agreement, none of those are present in this case. They haven't suggested it, but there was no subterfuge or effort by the Meltzer firm to avoid the payment of a commission otherwise due that could excuse compliance under the legal frustration that arises in this court as much as the state courts. You had a legitimate reason for wanting to have the transaction go down as it did, that was quite separate and distinct from your fee arrangement with this contract, with your contract, but what exactly is the release you want from this court? Do you want to not be obligated to the defendants at all? It goes two ways, one of which is because if you find there was a purposeful agreement of the parties to provide reasonable compensation to the management recruiter's firm for a service that was the sale of the business, they're not entitled to because they're not licensed and the law of New York and New Jersey both require that license. They don't have it. So under the statute— Your hands are unclean in that, too, then. All right. Let's get past the statute of—well, the statute of frauds is not barred simply by unclean hands. It really requires a very high level of misconduct to rule a party stopped or disentitled to raise it. But even if it is— I'm asking this because there is no question, as I understand it, but that they found the what your objectives were and brought the two together. They thought when they first did that that it was going to be an attorney placement. For all the reasons we've been discussing, it was instead a purchase of the business. And so you say it falls outside the contract. And so now what I'm asking you is, assuming for argument's sake that we were to agree with you that it falls outside the contract, what relief do you want here? One of two. The first is, under the New York Court of Appeals, New York telephone against Jamestown's case, if they're entitled to an implied contract to pay reasonable compensation, then they should be dismissal because they were the plaintiff and they failed to offer evidence of reasonable value. If not— What do you think they were owed? I'm sorry, Judge. What do you think they were owed for their efforts? If there were a trial, it would be what would the reasonable benefit be. There was a $40,000 consideration. If you viewed it from— And what attorney? And what attorney was hired? Right. One. Well, you could apply the—I suppose you could apply a 20 percent fee to the $91,000 paid to Mr. Weissler and award them $18,000. Your client, Ms. Lappin, said she understood that the fee agreement applied. You know, Judge, the answer is— Right in the middle of this. Yeah. She negotiated the fee agreement. She lived with it. We have cited, and Judge Hurley cited, New York's Brown Electric case in the Court of Appeals. The contract formation is not the subjective understanding of the parties. Contract formation is the objective manifestation of their conduct, their acts, and their writings. So even if she harbored a belief that it should apply in some fashion, all that would get them is quantum merit under an implied contract, so that they would either be disentitled because they don't have a license. If we are stopped somehow from raising that, then, in effect, they fail to offer evidence of it. If that is not the end, then there could be a trial to determine the reasonable value under an implied contract under the—it wasn't Waste Master. I'm trying to remember. There was such a welter of cases I went through in preparation. But one of the cases, the New York Court of Appeals case, I think it's New York Telephone against Jamestown. What is the reasonable value of the service if there was an expectation, an implied contract, that they'd be compensated? But isn't it true that once the district court found that Malfetti was entitled to this fee, that it did not consider other theories of liability? If we vacated the opinion below, wouldn't we have to remand? No, Judge, that occurred after the trial. The trial was a full trial before Judge Wechsler, and it's not in the record. If they mistakenly chose to rely upon express contract in the fee schedule to claim $400,000 and say the reasonable value is $400,000 and there's no other evidence, then either they didn't meet their burden of proving damages, and they get $1 or $0.06 for a breach— But aren't there other theories of liability that they could claim under this set of facts? It's a little late in 2019 for them to say, in effect, there was some frustration of contract to get into the bad faith conduct of precluding the performance of a broker. And the record doesn't show that here. There's something very disquieting about your client securing the benefits of these attorneys, but because of the vagaries of New Jersey law, et cetera, achieving it through a purchase of a business rather than through the placement of the attorneys. So to the extent that the parties did not contemplate that possibility when they first contracted, but the plaintiffs nevertheless put the groups together, I'm just trying to find out what you think is the appropriate outcome of an appeal here. And I mean, I hear you saying that basically you get to walk away with the benefit of their labors and not pay for it at all. Or in the alternative, I said— Or pay for the one attorney. No, I said, or alternatively, you could have a retrial to decide the reasonable value if they get past the light-sensing bar, the statute of frauds bar, and a failure of proof. But if you had it, then in effect, a remand would be for a trial to find the reasonable value to services under the New York Court of Appeals, New York telephone against Jamestown case, if there's an implied contract. You went to this firm to find a group of healthcare lawyers. They found you a group of healthcare lawyers. How you structured this, it seems to me, is your own business. That doesn't, it seems, in my view, subtract in any way from what they did for you. They did what you asked them to do. And it seems to me the agreement plainly covers it, the language about affiliates and the language about bringing these lawyers to you. Judge Pooler pointed out that they wrote—that Judge Hurley used the ninth definition. I think one at the top, an affiliate is subject to control. But beyond that, Judge, the point is this— I had no trouble whatsoever concluding that these people were affiliates. Then let me explain, let me give the answer to your question. The difference is that this firm acquired as a purchaser's stock came with a $2 million or more indebtedness. That means all the fees had to go into the firm, not to the Meltzer firm, or there would have been a preference, there would have been liability. So what happened is, it isn't as though the Meltzer firm took the transaction and got the benefit of 10 employees with a $1 million payroll, because as I said in the beginning, if they billed each one $100,000, they would have collected $200,000 in fees and they couldn't do that. It's not their fault that you made—your client made a foolish business decision. But Judge, you can't—first of all, this wasn't tried as an equity case, it was tried as a contract case, and Judge Hurley found that the fee agreement was a continuing contract that applied, and it doesn't fit, because then you run into the Waste Master case—I finally have the right to say it—which he rewrote it. It says if you employ, and we will pay 20 percent or 18 percent for group hires based upon compensation, which goes with the traditional notion that if a law firm hires an attorney, they pay him and they bill his services. I think the old ropes and gray formula used to be two and a half times the salary. I don't know what it is with overhead today. We don't—we're a small firm, we don't do that type of analysis. But the point was, the fees were not billed by Meltzer. They were not recovered by Meltzer. They were paid to Kern, they went to pay off Kern's obligations, and that's why the firm foundered. It's not a fair problem, because once the recruiters brought these people to you, you agreed to take them on, and then you chose a particular way of structuring their affiliation. But, for this record, we didn't take them on. There was an affiliation. They had to—the fees had to be payable to them. The firms couldn't merge because it was a Jersey firm. None of the economic benefits— What the firm found, and what there's evidence of, is that they were run effect. They portrayed themselves to the outside world as affiliated together, and that you got the benefit of both these firms now, which was what your client went to the defendants for here, or plaintiffs for here. You told them out as your health care lawyers. That wasn't it. They said there was an affiliation in them as a marketing man— You told them out as your health care lawyers. No, Judge. They were— Advertised? No. They were not on the firm website. They were not on the letterhead. The attorneys were on a different payroll. They had their own email system. There was no joint billing, was there? There was no joint billing, no joint collections, none of the indicia of being employees and profit earners for the Meltzer firm. If your honor finds it unfair in this record and determines that the recruiter somehow should be excused from not proving quantum merit damages of an implied contract to pay since you can't, without rewriting the contract in violation of waste masses and 110 other holdings, apply it to the purchase of a business, then, in effect, the most they could get is a retrial for reasonable value, and a district judge can examine the equities and decide what the economic elements of the transaction are and what is reasonable compensation. But it's not the schedule and the fee agreement, because that assumes that you hire 10 attorneys, you pay their salaries, you bill their services, and collect the fees. Separate books here, no collection of fees, separate telephone. They're not listed on the website. They're not listed on the letterhead. None of the profit-making elements of the contract is there. If you genuinely feel that they're not, if you decide it's a matter of law they're not barred by the statute of frauds and they're not barred by the express contract and their failure to offer proof of reasonable value, then the most they're entitled to is to persuade a fact finder what that reasonable value is, but it's not $400,000. Thank you. Thank you very much for your patience.